[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This matter is before the court on the wife's complaint and the husband's cross-complaint seeking dissolution of the marriage and other relief.
There is jurisdiction in this court. The parties married on September 8, 1989, in Torrington, Connecticut, and have resided in this state continuously for more than one year before filing of the action. The plaintiff has two children by a prior marriage to an alcoholic and abuser — Daniel, now 22, and Kristy, now 19. The defendant legally adapted both children in 1991. It is the first marriage for Mr. Petrosky. There are no minor children of this union and Mrs. Petrosky is not pregnant. The parties have not received public assistance at any time during the marriage. Each agrees the marriage has broken down irretrievably and there is no hope of reconciliation.
Over several days, testimony was taken from the parties, their children, the defendant's mother and sister, a long time friend of the defendant, and a friend of the plaintiff. Numerous exhibits were submitted; virtually all related to financial issues. Each party was ably represented by counsel and each presented a sworn, financial affidavit and proposed orders. The principal issues are the distribution of real and personal property and the parties' responsibilities vis-a-vis their current debts. Having heard the evidence, examined the exhibits, observed the witnesses' courtroom behavior and evaluated their credibility, and having carefully considered the applicable statutory and case law criteria for the dissolution of marriage, distribution of property (C.G.S. § 46b-81), and attorney's fees,[1] the court finds the following facts. CT Page 7362
The plaintiff was divorced from her first husband in 1986. They owned a home in Torrington which, when these parties married, was solely in Mrs. Petrosky's name. She is now 52 years old, has a Bachelor's Degree in Education (1972) and in Nursing (1975), and has completed approximately one-half of the course work required for a Master's Degree in Health Administration. Since 1975, she had been employed as a nurse. No longer able to work in an emergency room setting or otherwise provide active patient care because of work related knee injuries in 1995 and 1996 followed by bilateral knee replacements in 1998, she works now as the Outpatient Case Manager at Bristol Hospital. Having always been steadily employed (In the last twenty-five years, she has lost thirteen days of work.), she has often worked multiple jobs to support the family — particularly when the defendant was unemployed or unable to work for medical reasons. She is clearly no stranger to work and her training and experience is such that she is highly employable. Although assessed a 20% permanency of the right leg and a 35% permanency of the left leg for reason of the just referenced injuries (for which she still has pending compensation claims), no medical evidence was offered to suggest her career will end prematurely and the court finds that suggestion unfounded particularly since she is no longer employed as a nurse practitioner. Mrs. Petrosky also has a pending wrongful discharge claim against her former employer and a pending claim before the CHRO arising out of the same circumstances. She has a vested interest in a life annuity plan through the Charlotte Hungerford Hospital which will presently afford her income of $7,226 per year when she reaches the age of 65.
The defendant is fifty-four (54) years old. He had been employed by Hamilton Standard for many years until 1993 when terminated for reason unrelated to his job performance. With the exception of one (1) subsequent job which lasted approximately fifteen (15) months, Mr. Petrosky has, since 1993, gone from one temporary job to another with each such job followed by a period — sometimes substantial — of unemployment. Despite this history, the defendant elected not to pursue other employment options[2] but to remain instead in his field of materials control and that decision created significant emotional and financial stress within the marriage. The defendant also suffered from a number of physical injuries and/or medical conditions. Within the first two years of this marriage, he sustained a shoulder injury on the job for which he underwent surgery and he received $23,000 from a compensation claim, which money went into a joint household account. In August of 1998, he suffered a heart attack while in a restaurant and underwent an apparently successful quintuple bypass but his recovery was temporarily complicated by an infection occasioned by a femoral graft performed during surgery. He expected to return to work the following October but was instead advised his job had been eliminated; thus, there ensued another period of unemployment. For many years, the defendant has CT Page 7363 suffered from sleep apnea, a condition which now requires him to hook up to a breathing machine for eight (8) hours nightly. Finally, Mr. Petrosky is sexually impotent. If in fact this marriage was consummated. physical intercourse between the partners has been rare. Though Mrs. Petrosky's opinion is that her husband's efforts to seek medical help for this problem have been scant, this court finds otherwise. He has over the years undergone counseling, taken medications, and undergone injections without successful resolution of the symptomology. At this point, the only unexplored alternative is a penile implant. There was no evidence offered regarding the probability of surgical success and, given the circumstances of this marriage, the defendant's reticence to undergo that procedure is not unreasonable.
Prior to the marriage, the defendant purchased five (5) acres of Florida land worth from $25,000 — $30,000. He continues to have sole title to that land. With the exception of his one-half interest in the marital property, he owns no other realty and has resided with his parents in their home since March of 1998 when he moved out of the marital home.
Mrs. Petrosky quitclaimed one-half of her interest in the marital residence to the defendant in 1989. That property was refinanced in October of 1992 and increased the loan balance by approximately $12,000. That event occurred because Mr. Petrosky, immediately prior to the marriage, withdrew significant funds from a retirement plan he had through United Technologies and failed to have sufficient taxes deducted — thus the refinancing to satisfy that tax liability. Mrs. Petrosky's proposal she be reimbursed the entirety of the $12,000 increase in the mortgage balance ignores the fact that, although it was Mr. Petrosky's unwise decision not to have the appropriate taxes deducted, Mrs. Petrosky and her two children were the beneficiaries of the withdrawal. The majority of the money was used to finance a large wedding that resulted in $5,000 — $6,000 in cash gifts used to purchase new furniture, a honeymoon trip abroad, and a family trip to Washington, D.C. The amount remaining after expenditures was $10,000, which money, while it could have been used to satisfy the IRS debt, was instead placed in a certificate of deposit at the Bank of Boston and was, by April of 1990, expended entirely to meet household needs.
Prior to the marriage, Mr. Petrosky had a 401K retirement plan valued at $52,055.33 on December 31, 1988 (eight months prior to the marriage) and $62,945.56 as of May 5, 1999 — and that is so despite significant withdrawals.[3] He also withdrew $7,800 in the year 1999 despite automatic orders having entered and despite having permission of the court to do so. He also had one or more IRA accounts from which he withdrew significant sums ($8,250 from 10/30/95 — 1/5/96), which CT Page 7364 accounts he testified are now completely closed though it is not known whether they were depleted before being closed or whether the funds remaining in the accounts when closed were deposited in his retirement or still another account. Additionally, the defendant maintained a separate checking account at Bank of Boston about which the wife knew little. He maintained records pertinent to that account in a brown paper bag in their bedroom and, when discovered by the wife at or about the time of their separation, they were not sufficiently complete to determine what was in the account at any given time though they did establish Mr. Petrosky made frequent withdrawals from them as well. During most of the marriage, the defendant gave the plaintiff $350.00 week which, together with her earnings, was used to pay household expenses.[4] He assumed responsibility for taxes and insurance for his own vehicle, a 1992 Chevrolet Lumina, but it was Mrs. Petrosky whose responsibility it was to manage the household finances and pay the bills. Beginning as early as 1993, it became clear the family had mounting bills and clear problems making ends meet. Though the couple reported median yearly wages of $74,236.60 for the ten year period from 1989-1998,[5] that does not represent the total of monies available to run the household because Mr. Petrosky's contribution was limited to $350.00 week — or $18,200 yearly. Arguments over money became frequent. Mrs. Petrosky's anger and resentment multiplied because her husband refused to accept responsibility for handling the finances at the same time he continued to contribute only $350.00 week. Finally, in 1995, they sought the assistance of Consumer Credit Counseling Service of Connecticut, Inc. (CCCS) and agreed upon a debt management plan which at first called for their making monthly payments of $621.00 (which would permit the paying off of all old debts in four years) but which Mrs. Petrosky re-negotiated to $250.00 month when Mr. Petrosky stopped making payments of $325.00 week ordered by this court pendente lite.[6] Mr. Petrosky's stock response to Mrs. Petrosky's request he contribute more money was that she should "make ends meet."
Both parties are, however, at fault with regard not only to the family's financial problems but in failing appropriately to address the significant sexual and communications problems between them. Regarding the financial issues, Mrs. Petrosky's failing was her inability to face squarely the fact that Mr. Petrosky's contribution together with their debt level made enormously difficult providing the children private school education on the secondary and college levels. As implacable as Mr. Petrosky was on his weekly contribution, Mrs. Petrosky was as rigid about the fact her children not go to the Torrington public schools and that meant, for example, significant sums for attendance at St. Francis of Assisi in Torrington, St. Anthony's in New York, and, with regard to college, Molloy College in New York for Kristy and Sacred Heart University in Fairfield for Daniel. Her testimony that private colleges CT Page 7365 were necessary because no Connecticut state school offered degrees in either Kristy's area of interest (music therapy) or Daniel's (criminal justice) is inaccurate[7] and suggests it was Mrs. Petrosky's objective their educations be in private schools. Once the decision to send them to these schools was made, it not only necessitated this couple's application for loans more significant than would have been required had they attended state colleges but it also meant the children then needed cars (with all the attendant expenses) to get home and/or to their part-time college jobs but also, at least in Kristy's case, additional money for an apartment, food, utilities, etc. These decisions flew in the face of this couple's financial restraints and placed unnecessary additional pressure on the marriage. One of the most hotly contested issues was Mr. Petrosky's obligation to pay half the amount of the loan obligations for Kristy (who is completing her sophomore year) and Daniel (who has just graduated from college). Mr. Petrosky, though the legal parent of these children, states he has no such obligation; he denies ever having signed any loan application. There is no question Daniel signed his father's name on an application requiring the father's signature (He states his father gave him permission to do that over the phone.) and there was evidence from both children Mr. Petrosky had given his wife permission to sign his name on another college loan application. More to the point, however, Mr. Petroksy, in response to a question by the court, agreed he endorsed a promissory note for Daniel on September 22, 1997 (Plaintiff's Exhibit #18), the terms of which clearly and in boldface stated the endorser understood the loan was a federal loan which the endorser (the defendant) was required to repay if the borrower (the plaintiff) did not repay. Additionally, the evidence conclusively established Mr. Petrosky attended and took notes at seminars regarding colleges, the financing of college educations, available funding, etc., that he gave to Mrs. Petrosky pay stubs so that she could provide accurate income information, that he visited schools with his wife and children and that he told the children he would do what he could to support their education. Nothing the defendant said or did indicated an unwillingness to share this financial burden despite the fact he had made clear his belief they should be educated at public schools.
After the first years of the marriage, there existed no communication between the two. He worked the first shift; she worked the second shift and he was in bed by the time she returned home. They disagreed on child raising issues; Mr. Petrosky felt strongly the wife was physically abusive to them and she felt she should be the one to discipline them because they were her natural children and that he therefore should have little input in the matter. In fact, once Mrs. Petrosky struck Kristy with a sufficiently forceful blow as to cause Kristy to experience a temporary hearing loss and to report the mother's behavior at her New York school; that resulted in Mr. Petrosky arranging for Kristy to be CT Page 7366 brought from the school to relatives of Mrs. Petrosky in Massachusetts without the knowledge of Mrs. Petrosky. As a result of a DCS investigation begun in New York, Mrs. Petrosky underwent counseling and the DCS file was eventually closed without further action. The children denied the accounts of Mr. Petrosky and two other witnesses (his longtime friend and his sister) that Mrs. Petrosky was on other occasions both verbally and physically abusive to them. The defendant felt she was not raising the children with good moral values because she appeared to condone Kristy's theft of $1,100 from him using his ATM card taken from his briefcase (She repaid him that amount.), she permitted Daniel and his girlfriend to sleep in the same bed in their home, and because she either permitted them to drink while underage (in Daniel's case) or to be in the company of other young people who drank while underaged. of interest is that, though Mrs. Petrosky's first husband was an alcoholic and abuser and though the testimony was that she was particularly sensitive to alcohol issues, both partners in this marriage have such issues themselves. Both are drinkers and sometimes drink to excess. Though Mrs. Petrosky appears to have a greater tolerance for alcohol, he shows the effects after just two or so drinks and he has been involved in car accidents after drinking. Her response to that was bizarre; rather than encouraging him to seek counseling or to persuade him to stop drinking, her response was to arrange for him to be driven home when he had had too much to drink and to encourage him to "eat first."
She regrets the absence of sex in the marriage — and, even more so, the absence of intimacy between them. Observing them both over the course of three or four days, it is obvious they are not well met. Mrs. Petrosky is effusive, outgoing, demonstrative and very expressive; she punctuated the testimony of others by responding with gesticulations and emphatic facial and body movements. Mr. Petrosky appears non-verbal, unemotional, and very closeted. She is the dominant partner and the hub of the family wheel. While she is eager to enjoy the touching and sharing which usually characterize a healthy relationship, he keeps everything inside and prefers to read or watch television than to engage in the daily intercourse of married life. Yet, Mrs. Petrosky is not without fault here either. Her independence, assertiveness, and personal style worked to stifle the joint decision making which might otherwise have existed and which might have avoided for them some of the financial and emotional stress endured. While she was at first encouraging of his efforts to address his sexual dysfunction and was in the early years of the marriage patient in that regard, those feelings gave way to anger and resentment which eventuated in name calling, accusations regarding his sexual orientation, and to her seeking the physical intimacy of which she was deprived within the marriage outside the home. Although the plaintiff repeatedly denied having extramarital affairs and similarly denied ever telling her husband or his good friend she was finding sexual CT Page 7367 satisfaction elsewhere, other evidence from the plaintiff herself ineluctably leads to that conclusion.[8]
Despite such finding, the primary cause of the breakdown is the partners' inability to communicate on any level, the absence of shared interests, and increasing tensions within the home.
Also before the court was the plaintiffs Motion For Contempt of April 13, 2000 (#117), regarding Mr. Petrosky's failure to honor the pendente lite orders of May 14, 1999.[9] The order is clear and unambiguous and, in view of the history of payment for some months thereafter, it was clearly understood by the defendant. Mr. Petrosky wilfully failed to comply with the order though he had available to him the necessary funds. He is found in contempt of that order.
ORDERS:
In entering these orders, the court has considered the statutory requirements of C.G.S. §§ 46b-81 and 46b-87, applicable case law, the evidence, findings of fact, the parties' claims, and their proposed orders. There is jurisdiction and all statutory stays have expired. The court enters the following orders:
1. The marriage having broken down irretrievably; it is hereby dissolved.
2. Neither party shall pay periodic alimony to the other except as below ordered.
3. Each party shall pay his/her own attorney fees.
4. The husband shall transfer all of his right, title and interest in the marital residence located at 9 Lynn Heights Road in Torrington, Connecticut, to the wife and she shall hereafter be solely responsible for the mortgage, taxes, and insurance and shall indemnify and save harmless the husband thereon.
5. The husband will reimburse the wife the amount of $6,000, which represents one-half the tax liability he incurred when he withdrew $36,137.00 from a retirement plan immediately prior to the marriage and which was paid by refinancing the wife's home. That amount shall be paid within thirty (30) days of the date of this judgment.
6. The husband shall be responsible for one-half of the remaining educational debt for both children. The wife shall provide the husband verification of the current balances as of this date and, within thirty (30) days of presentment of the same, the husband shall forward to each CT Page 7368 payee a certified check in one-half the amount due each and simultaneously provide the wife through her counsel copies of the same.
7. The husband will be responsible for one-half of the CCCS debt consolidation loan by forwarding to the wife's counsel, within thirty (30) days of this date, a certified check made payable to Connecticut Consumers Credit Services in the amount of $5,419.00. The check shall reference client #1063814.
8. The husband shall pay to the wife the amount of $14,100.00, which sum represents the arrearage owed from mid-September of 1999 to the present under the court order of May 14, 1999 ($12,350), a fine of $1,000.00 for the wrongful detention of such money, and payment of $750.00 to the wife's attorney as his fee for the preparation, filing and prosecution of the Motion for Contempt. Two certified checks — one made payable to Nancy Petrosky in the amount of $13,350 and one made payable to Steven Levy, Esq. — shall be forwarded to Steven Levy, Esq. — within ten (10) days of this date.
9. The husband shall reimburse Nancy Petrosky one half of the amount of the amount still owing for the mortgage, interest and late charges with regard to the March and April, 1999, payments on the marital residence. That amount of $1,100 shall be paid the wife in two checks of $550.00 — one payable on or by August 1, 2000, and the second payable on or by September 15, 2000.
10. The husband shall pay the wife $1.00 per year as periodic alimony for debt indemnification until such time as all debts here ordered payable by him have been paid.
11. The husband shall retain sole and exclusive title to the land in Naples, Florida.
12. The husband is awarded the 1992 Chevrolet Lumina and the 1979 Olds Delta 88 and shall indemnify and save harmless the wife thereon.
13. The husband shall remove the 1979 Olds Delta 88 from the marital property within ten (10) days of this date.
14. The wife is awarded the 1995 Olds Cutlass and the 1993 Subaru Legacy and shall indemnify and save harmless the husband thereon.
15. The husband shall retain all interest in his Hamilton Standard pension and 401K account free and clear of any claims by the wife.
16. The wife shall retain all interest in her CHH retirement plan and CT Page 7369 any proceeds received regarding her worker's compensation claim and her wrongful discharge claim against CHH and her CHRO claim. Such proceeds shall be free and clear of any claims by the husband.
It is so ordered and judgment shall enter on the plaintiffs complaint.
Sheedy, J.